Judgment rendered September 27, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,235-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

\* \* \* \* \*

IN RE: INTERDICTION OF
LESSIE EUGENE JONES

\* \* \* \* \*

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. P-20220122

Honorable Daniel J. Ellender, Judge

\* \* \* \* \*

| | |
|---|---|
| ROUNTREE LAW OFFICES<br>By: James A. Rountree | Counsel for Appellant<br>Lessie Eugene Jones |
| | |
| HUDSON, POTTS & BERSTEIN, LLP<br>By: Margaret H. Pruitt<br>Jason R. Smith | Counsel for Appellee<br>Marilyn Sue Skirvin |

\* \* \* \* \*

Before PITMAN, THOMPSON, and MARCOTTE, JJ.

**THOMPSON, J.**

The out-of-state niece of an 87-year-old retired college professor filed a petition to interdict him, seeking to be appointed as curator. She and her children had historically been the residual legatee in an earlier version of her uncle's estate in his last will and testament, and she had been named as his agent in a previous power of attorney. However, her uncle had made some changes to his estate planning that lessened the value of the bequests to her and her children, and he eventually revoked her power of attorney for one in favor of his long-term companion. Using her power of attorney, the niece obtained $5,000 of her uncle's money, which she then utilized to retain an attorney to seek to interdict him.

Her petition for interdiction, and the associated requests for restraining orders and injunctions, alleged that her uncle was not capable of making reasoned decisions due to his medical diagnosis of mild to moderate dementia and that he was subject to the influence of his long-term companion, who resided in the home with him. Allegations of financial impropriety and lack of appropriate care by his companion were repeatedly asserted by the niece, and she conveyed similar allegations to her uncle's treating physician and financial institutions where he banked. The trial court appointed a geriatric psychiatrist as medical examiner and, after a hearing, ordered the full interdiction of the uncle, appointing the niece as curator of his property and the companion as curator of his person. There was absolutely no evidence presented by the niece to support her repeated claims of financial impropriety or lack of appropriate care for her uncle by his companion. The uncle now appeals, assigning as error that his niece did not

satisfy her burden of proof by clear and convincing evidence that full interdiction was warranted; that the power of attorney in place in favor of his companion prior to the interdiction proceedings was a valid act and therefore less restrictive means to his full interdiction existed; and that *if* he were interdicted, then his companion should be appointed as his curator rather than his out-of-state and now somewhat alienated niece. We find no error in the trial court's order of a full interdiction under the very unique and complex adversarial circumstances that exist in this matter. However, we do find error in naming the niece as curatrix of her uncle's property, and amend the judgment to name the companion as the curator of the person and property of the uncle, with the niece named as his undercurator.

## FACTS

Lessie Eugene Jones (hereinafter, "Dr. Jones"), age 87, is a retired professor from the University of Louisiana in Monroe, where he taught in the College of Business Administration for 30 years. In addition to earning his Ph.D. and serving as a college professor for over three decades, Dr. Jones was also in the restaurant business. He owned and operated several local restaurants in the Monroe area until he eventually sold them. Dr. Jones, who continues to reside in Monroe, Louisiana, never married and did not have any biological children or adopt anyone. He is appealing the judgment of the trial court which ordered his full interdiction and named different curators over his person and his finances, contrary to his wishes.

Marilyn Skirvin (hereinafter, "Skirvin") is Dr. Jones's niece, who resides on a family farm in Indiana and filed the petition to interdict Dr. Jones. Skirvin is a longtime resident of Indiana, from where Dr. Jones also

originally hails. Skirvin worked for 21 years as the Vice President of Economic Development for the Bloomington Economic Development Corporation and has two adult children and multiple grandchildren. Skirvin asserts she enjoyed a very close and loving relationship with Dr. Jones her entire life, until recently, including annual visits to Monroe. Dr. Jones also visited her in Indiana over the years. The judgment of the trial court named Skirvin as undercurator of Dr. Jones's person and as curator of his finances. She is not appealing the ruling of the trial court.

Gary Lloyd Anderson (hereinafter, "Anderson") is identified in the record as Dr. Jones's companion and caregiver and that he and Dr. Jones have lived together at 102 K Street in Monroe, Louisiana, for 20 years. Anderson is named by the trial court as the undercurator for Dr. Jones's finances and curator of his person.

A chronology of pertinent events preceding the initiation of these interdiction proceedings is helpful for a better understanding of the unenviable position in which Dr. Jones now finds himself and the very unique, contentious, and litigious environment in which he may very well spend the remainder of his life. On November 26, 2003, Dr. Jones executed a power of attorney in favor of his niece, Skirvin. The power of attorney was prepared by attorney Richard Campbell. On February 19, 2010, Dr. Jones signed a last will and testament, drafted by attorney Campbell, bequeathing his home to Skirvin and her children. The 2010 will provided for a particular legacy to Anderson of $25,000. On February 25, 2020, Dr. Jones signed a codicil to the 2010 testament, prepared by attorney James Rountree, in which he bequeathed the home at 102 K Street to Anderson.

3

The record reveals that Skirvin's concerns related to Dr. Jones's finances and health arose just prior to the February 25, 2020 codicil, in or around January 2020. Dr. Brian Calhoun (hereinafter, "Dr. Calhoun") is a family medicine doctor in Monroe and has been treating Dr. Jones since 2018. The record includes medical records from Dr. Calhoun's office containing "patient call notes," beginning with entries from January 1, 2020.

On January 8, 2020, the patient call notes provide the first mention of Dr. Jones's dementia. The chart note reveals that Skirvin initiated contact with Dr. Calhoun's office to notify them that she had power of attorney for Dr. Jones, and she would attend his upcoming appointment to discuss a recent fall, medications, and "to discuss Alzheimers." The January 2020 patient call notes show Dr. Jones's initial diagnosis of cognitive decline or dementia by Dr. Calhoun. At that time, Dr. Jones was referred to Dr. Brian Stucki (hereinafter, "Dr. Stucki"), a neurologist. Dr. Jones began seeing Dr. Stucki every three to six months, beginning in May 2020. Dr. Calhoun's patient call notes during this time period also show that Anderson frequently contacted his office allegedly on Dr. Jones's behalf with specific questions regarding administration of medications and general medical treatment.

On December 14, 2020, Skirvin again contacted Dr. Calhoun, expressing concerns regarding Anderson's caregiving, specifically administration of supplements and over-the-counter medication Benadryl. The patient call note provides: "[Skirvin] was told he had 50% memory loss which I have never told as I don't give percentage of memory loss; niece has attorney to help her with this." The source on which Skirvin based her

4

assertion regarding Dr. Jones's alleged 50% memory loss was never revealed or called to testify.

Additional patient call notes from April 30, 2021, reveal that Anderson called Dr. Calhoun's office with a question regarding Dr. Jones's continued use of baby aspirin, since he was also taking the prescription medication Eliquis. A misunderstanding on Dr. Calhoun's end resulted in his returning the call to Anderson, leaving a message insisting Dr. Jones must continue taking the Eliquis. A subsequent call note on that date reveals that Anderson clarified that he had asked Dr. Calhoun about discontinuing the aspirin, *not* the Eliquis. It appears that in the meantime, Dr. Calhoun spoke with Skirvin about the administration of Dr. Jones's medications. On May 3, 2021, the patient call note provides:

> There initially was a concern that his caregiver, Mr. Anderson wanted to stop the Eliquis. However, when we called him back stating Mr. Jones needed to remain on the Eliquis, he stated that he never said anything about stopping the Eliquis but wanted to know if he needed to stop his ASA. Ms. Skirvin continues to have great concerns for her uncle and the care he is receiving from Mr. Anderson. I did agree Mr. Jones should not sign any documents due to his dementia.

On September 15, 2021, Dr. Jones executed a donation, prepared by attorney Rountree, "[i]n consideration of his gratitude for assistance in his declining years," donating an undivided one-half interest in his home to Anderson, who had been his companion and caregiver for almost two decades by that time. This is the same residence which was included as a specific bequest to Anderson in Dr. Jones's 2020 last will and testament.

On September 27, 2021, Dr. Jones fell at home. The record shows that Dr. Jones fell in his bathroom when taking a shower. The following

morning, on September 28, 2021, Anderson called Dr. Calhoun's office to report the fall. Anderson explained that Dr. Jones was not actively bleeding, had a bandage on the "scrape" on his head and stated he did not want to go to the ER. It was later confirmed that at the time, September 2021, Anderson and Dr. Jones were significantly concerned about possible exposure in a hospital setting to COVID-19, considering Dr. Jones was 86 at the time. Dr. Calhoun's office staff instructed Anderson to take Dr. Jones to the ER. That afternoon, Anderson took Dr. Jones to an urgent care clinic. Dr. Jones was transferred to the ER, where he was diagnosed with an intracranial hemorrhage. After testing, including MRIs and a CT scan, and several hours of observation, Dr. Jones was sent home, without the need to be transported to Shreveport or receive a higher level of care.

The record contains two letters from one week later, dated October 4, 2021, prepared by Dr. Calhoun. One letter states Dr. Jones "was first diagnosed with dementia in January of 2020. His dementia is now of moderate severity, and he should not be signing any legal documents without his Power of Attorney present." The second letter, also dated October 4, 2021, states in its entirety: "Due to Mr. Jones declining health and advancing dementia, I recommend Mr. Anderson be removed from Mr. Jones care.[1] If any further information is needed, please contact my office." It is apparent from the record these letters were initiated, if not prepared by, Skirvin and submitted to Dr. Calhoun. There was no corresponding acute medical treatment being provided to Dr. Jones on the date of these letters.

_____

[1] The record shows that Skirvin later clarified that the letter is intended to read, "Mr. Jones be removed from Mr. Anderson's care."

Skirvin's motive in obtaining the letters from Dr. Calhoun became evident almost immediately.

Two days after receiving the letters from Dr. Calhoun, on October 6, 2021, Skirvin went to Cross Keys Bank, one of the banks utilized by Dr. Jones, and provided them with a copy of the letters. Skirvin went to the bank alone that day, notably without Dr. Jones present. The record shows that Dr. Jones owned a certificate of deposit ("CD") worth approximately $12,000 at the bank, which had matured. Skirvin directed $5,000 of the CD funds be used for a cashier's check made out to Richard Campbell, an attorney Skirvin had retained, for legal services in these interdiction proceedings against Dr. Jones. Dr. Jones later testified that Skirvin did not have express approval from him to use $5,000 of his funds for an attorney to file suit to interdict him. Taking $5,000 of his money and instituting the interdiction proceeding was cause for considerable consternation by Dr. Jones directed toward Skirvin, as will be more fully detailed below. Skirvin deposited the remaining funds from the CD into Dr. Jones's savings account.

Approximately three weeks later, on October 27, 2021, before the interdiction proceeding had been instituted, Dr. Jones executed a new power of attorney with the help of attorney Rountree, naming Anderson as his power of attorney. One of the witnesses to the power of attorney was Dr. Jones's long-time friend, Nanette Dennig, who works in attorney Rountree's law office and is a notary public. Anderson was present with Dr. Jones at attorney Rountree's office during the discussion of the new power of attorney; the record shows that Anderson was instructed by attorney Rountree not to speak when questions were addressed to Dr. Jones, to ensure

the responses Rountree received were accurately from Dr. Jones. Rountree was apparently satisfied Dr. Jones was accurately and independently conveying his wishes and intentions, and the power of attorney was drafted, reviewed by Dr. Jones, and then signed before him in the presence of two witnesses and notarized by Rountree.

On December 14, 2021, Dr. Jones executed a revocation of the previous power of attorney in favor of Skirvin from 2003. In a letter on the same date, attorney Rountree informed Skirvin: "Mr. Jones became concerned when he discovered that you had withheld $5,000 from the deposit you agreed to make on his behalf. He learned from the bank that $5,000 had been transferred to Richard Campbell. That made him concerned about the possibility of an interdiction proceeding, which would be totally inappropriate." In this letter to Skirvin, attorney Rountree attached a letter from Dr. Stucki, Dr. Jones's treating neurologist. Dr. Stucki's letter, dated December 2, 2021, provided, as follows:

> Lessie Jones (DOB 4/17/1935) has been under my care for dementia which is in the mild stages. He does need help with some of his finances, but he still has the mental capacity to be able to make decisions regarding which financial adviser or power of attorney he would like and is still able to make decisions if they are explained in somewhat simpler terms to him.

The December 14, 2021 letter to Skirvin from attorney Rountree further provided that the statement from Dr. Stucki "should discourage any thought of interdiction. Mr. Jones has appointed Lloyd Anderson as his agent to assist him as suggested by the neurologist." The record reflects this assistance had been provided by Anderson when requested by Dr. Jones over the years.

8

On January 12, 2022, Skirvin filed the petition for interdiction. The petition alleged that after a diagnosis of dementia, Dr. Jones switched his power of attorney from Skirvin to Anderson. The petition asserted that Anderson is "in no way legally affiliated with Dr. Jones and is not a relative." The petition alleged that Skirvin, whose address was listed as Bloomington, Indiana, is qualified to serve as curator over Dr. Jones's estate. The petition further alleged that Anderson is not entitled to preferential treatment under La. C. C. P. art. 4561[2] because at the time of the execution of the power of attorney, Dr. Jones was not capable of making a reasoned decision due to his medical diagnosis. The petition alleged that Dr. Jones's dementia was treated with numerous medications, and also noted that he is blind in one eye and has limited mobility. The petition also asserted that Dr. Jones is "subject to the influence of Mr. Anderson, such that his property and person are in imminent danger. He is no longer capable of making reasoned decisions regarding the care of his person or his property." The petition asserted that a full interdiction was necessary for Dr. Jones's own protection and that his interests could not be protected by less restrictive means. A preliminary protective order was filed with the petition, specifically alleging abuse by Anderson to both Dr. Jones's person and property.

Pursuant to the filing of the petition and preliminary protective order, the trial court issued an ex parte temporary restraining order prohibiting

---

[2] La. C. C. P. art. 4561(C)(1) provides, in pertinent part, that the court shall consider the qualified persons in the following order of preference:
(a) A person designated by the defendant in a writing signed by him while he had sufficient ability to communicate a reasoned preference.

9

Anderson from using his power of attorney, as well as ordering his removal from the premises of 102 K Street, Monroe, Louisiana.[3]  On January 14, 2022, Anderson filed a motion to vacate the temporary restraining order. Anderson argued that he had served as Jones's caregiver for 18 years, during which time he resided with Dr. Jones.  Anderson asserted that there were no circumstances justifying the issuance of the temporary restraining order, or that any threat existed to Dr. Jones's person or property.  Anderson asserted that Dr. Jones needed assistance due to his frailty but not because he was mentally incompetent.

On January 18, 2022, Skirvin filed a supplemental and amending petition for temporary restraining order and for preliminary injunction, claiming that she had ongoing concerns that Anderson was taking action that was detrimental to the health and well-being of Dr. Jones.  Further, Skirvin reiterated her claimed concerns that Anderson would dispose of Dr. Jones's property.  Along with the petition, a motion to appoint a medical examiner was filed by Skirvin, naming Dr. Frank Weinholt (hereinafter, "Dr. Weinholt"), a geriatric psychiatrist, as the proposed court-appointed expert.

On January 20, 2022, a hearing was held on the petition for temporary restraining order and preliminary injunction.  Dr. Calhoun testified at the hearing as Dr. Jones's primary care physician, saying he treats patients with dementia but does not have specialized medical training in mental decline or psychiatry.  Dr. Calhoun testified that he is qualified to make the diagnosis of dementia, but not Alzheimer's disease.[4]  Dr. Calhoun testified that in the

---

[3] Anderson was removed from the home by police, spending one night away.  He was able to return the following day.

[4] The record does not contain evidence that Dr. Jones has ever received a diagnosis of Alzheimer's disease.

fall of 2021, Dr. Jones received a score of 23 out of 30 on the Montreal Cognitive Assessment ("MoCA") Test for dementia, which indicates only mild impairment. Dr. Calhoun further testified that he agreed with Skirvin that as of May 2021, Dr. Jones should not be signing legal documents. Dr. Calhoun described the evidence he observed of Dr. Jones's mental decline as forgetfulness, becoming visibly weaker, and requiring some assistance with walking. Dr. Calhoun testified that Dr. Stucki, the treating neurologist, had modified some of Dr. Jones's medication that were originally prescribed to him. Dr. Calhoun further testified that he had never communicated directly with Dr. Stucki about Dr. Jones's medical treatment, and that he had never witnessed Dr. Jones experience any hallucinations, paranoia, or unusual behavior in his clinic. An issue with a medication prescribed by Dr. Calhoun, which is known to exacerbate the symptoms described by Skirvin and Dr. Calhoun, was raised by Dr. Stucki, who subsequently discontinued the prescription.

Dr. Calhoun was questioned regarding the October 4, 2021 letters he submitted related to Dr. Jones's capacity to execute legal documents:

> Q: What prompted you to write that letter, Dr. Calhoun?
>
> A: There was a phone call from Ms. Skirvin and she had just concerns about his wellbeing, concerns about finances, and that – that decisions might be made on his part that she felt that most likely she needed to be there.

Dr. Calhoun testified that in his opinion, Dr. Jones did not have the capacity to make the decision to remove Skirvin as his power of attorney and put Anderson in her place. On cross-examination, Dr. Calhoun admitted that both Dr. Stucki and Dr. Weinholt would be more qualified than him to

11

diagnose and treat dementia in elderly patients. Dr. Calhoun testified that in his opinion, a lawyer should require a medical opinion regarding capacity in order for a client with cognitive decline (like Dr. Jones) to validly execute a legal document, even if the lawyer thoroughly questioned him regarding his capacity and intentions and received responsive answers. When questioned directly by the trial court judge, Dr. Calhoun testified that he had never met Skirvin, and she had not attended any appointments at his office with Dr. Jones. He testified he did not have concerns about Anderson prior to these interdiction proceedings "[b]ecause he was there at every appointment with him." Apparently, it was only the allegations by Skirvin about Anderson that raised any concern with Dr. Calhoun, as he had never witnessed any conditions prompting him to independently make note of it in his records. Dr. Calhoun concluded that his opinion regarding Dr. Jones's legal capacity in May 2021 had not changed since he wrote the October 4, 2021 letters.

Skirvin testified at the hearing on the temporary restraining order and preliminary injunction. She testified that she typically visited her uncle one to two times a year in Monroe. In 2003, Dr. Jones executed a power of attorney in her favor during one of her visits. In 2010, Dr. Jones provided her a copy of his will, and she witnessed him place a copy of the will in his safe. Skirvin testified that throughout the years during her visits, she saw the will in his safe "each and every time," at her uncle's request when they went over his affairs together. Skirvin testified that in January 2020, she attended one appointment at Dr. Calhoun's office with Dr. Jones and Anderson to go over medications and to discuss his dementia diagnosis. Skirvin testified that she had weekly telephone calls with her uncle. She testified that the

12

calls were not private; they took place on speaker phone due to Dr. Jones's difficulty hearing. Skirvin alleged she would "hear [Anderson] whispering to her uncle how to answer." She also testified that Anderson restricted her ability to visit Dr. Jones and threatened to move him to Georgia. Skirvin recorded some of her telephone calls with Dr. Jones because she heard Anderson saying what she described as troubling things to him, including yelling at him and instructing him on how to respond.[5] Skirvin testified that she first became concerned about Anderson's caregiving in January 2020. She claims her concerns were heightened when Anderson allegedly withheld care from Dr. Jones until the day after his fall in the bathroom on September 27, 2021.[6] She spoke with Dr. Calhoun, who recommended Dr. Jones be removed from Anderson's care. Skirvin testified that when she went to Cross Keys Bank on October 6, 2021, she did not misappropriate $5,000 but used it to engage attorney Campbell in order to protect Dr. Jones. Skirvin testified that she spoke with Dr. Jones about this and suggested that they use $5,000 for an attorney to protect him and his assets because the doctors were concerned about his care. Skirvin testified that prior to these interdiction proceedings, she last saw her uncle on October 14, 2021. On that date, she witnessed him acting confused and agitated.

At the conclusion of the hearing on January 20, 2022, the trial court signed an order to modify the temporary restraining order, allowing Anderson to contact Dr. Jones and enter and remain at the home at 102 K

---

[5] Audio of the telephone calls between Skirvin and Dr. Jones was entered into evidence at the hearing.

[6] As noted above, when Anderson took Dr. Jones to be examined, after testing there was no additional treatment deemed necessary or recommended.

Street.  Additionally, the trial court granted the motion to appoint Dr.

Weinholt as medical examiner in this matter.  The trial court also ordered

Anderson to refrain from using his power of attorney, and set weekly

visitation between Skirvin and Dr. Jones.

On April 8, 2022, Dr. Jones attended his examination with Dr.

Weinholt, the court-appointed medical expert.  On May 27, 2022, Dr.

Weinholt issued his report.  The report begins:

> In response to your request, Mr. Lessie Jones was
> seen on April 8, 2022, at my office in West
> Monroe, LA, for the purpose of assessing his level
> of dementia and his ability to choose his Power of
> Attorney.  He was brought by his caregiver, Mr.
> Lloyd Anderson.  Mr. Jones was first interviewed
> by himself, then in conjunction with his caregiver.

Dr. Weinholt's report further provides:

> [Dr. Jones] does indeed suffer from a dementia
> that can be characterized as mild to moderate.  He
> is still able to do all his own ADL's (*activities of
> daily living*).  His dementia renders him impaired
> in recall, calculation, task solving, praxis,
> planning, etc.  But at the same time, his dementia
> is not severe enough that he […] is unable to know
> and make known his own wants and needs.

Dr. Weinholt's report states that Dr. Jones is aware that he is impaired, and

"he retains the ability to choose who he wants to help him with areas that he

recognizes he is impaired in."  Dr. Weinholt's report provides that upon

more formal testing during his examination, Dr. Jones scored an 11-12 on

the MoCA Test, indicating mild to moderate dementia.  The report notes that

Dr. Jones has some difficulty finding words, but is able to make himself

understood.  Dr. Weinholt's report concludes:

> It has been my experience that in many similar
> cases, courts have always followed the principle of
> the least restrictive alternative, which in this case

14

> would allow the patient to continue to rely on his partner of 20 years and allow him to serve as his Power of Attorney. Given Mr. Jones's ability to still choose who he wants to serve in this position, as well as his understanding of what this involves, there appears to be no compelling need for the assignment of a Curator.

On June 2, 2022, a hearing was held regarding Dr. Weinholt's report. Skirvin raised issues with the report and argued that Dr. Weinholt applied an improper standard in reaching his conclusions. Specifically, Dr. Weinholt's report referred to a power of attorney, but did not expressly provide his response to the question of whether Dr. Jones was able to consistently make reasoned decisions as to his person and property as set forth as the threshold consideration in La. C. C. art. 389. Skirvin argued that Anderson's presence during part of Dr. Weinholt's examination was improper, and Anderson provided him with inaccurate information. In response, Anderson argued that he simply transported Dr. Jones to his examination. Further, Anderson noted that Dr. Weinholt's conclusions, including the appropriateness of a power of attorney, reflected his experience in providing his medical opinion in interdiction proceedings. The trial court concluded that the report did not answer the specific question he was asked to answer – whether Dr. Jones is capable of consistently making reasonable decisions regarding the care of his person and/or property. Therefore, the trial court ordered a continuance to allow for his deposition to supplement the information contained in and considerations in preparing his report.

On June 22, 2022, Dr. Weinholt was deposed in order to clarify his expert opinion. Dr. Weinholt testified that after medical school, he received specialty training in psychiatry and practices primarily in the field of

15

geriatric psychiatry. During his deposition, Dr. Weinholt noted that Dr. Jones referred to Anderson as his "partner." Dr. Weinholt testified that he requested a portion of his interview with Dr. Jones be conducted with Anderson present in order to fully assess Dr. Jones's level of functioning. During the deposition, Dr. Weinholt was questioned by Skirvin's counsel regarding the standard for interdiction:

> Q: […] On his own, is he able to consistently make reasoned decisions regarding the care of his person and/or property?
>
> A: Absent anyone that he trusts to help him?
>
> Q: Yes.
>
> A: Absent that? Then I don't think so. No.
>
> Q: Okay.
>
> A: Absent that. But again, the decision to rely on someone I think is a reasoned decision.

On July 7, 2022, the two-day final interdiction hearing began. Dr. Weinholt testified at the hearing, corroborating his testimony from his deposition and the opinions contained in his report. Dr. Weinholt's in-person testimony concluded with questioning by the trial court judge on the threshold issue of interdiction:

> Q: So, just in conclusion, you don't believe that he can consistently make reasoned decisions about his person, his property on a daily basis, but you do believe that he has the capacity to choose who he would like to do that for him?
>
> A: Right.
>
> Q: To assist him with that?
>
> A: Right.

Anderson testified at the hearing, stating that he has lived at 102 K Street with Dr. Jones for 20 years and that he assists Dr. Jones in paying his bills, but Dr. Jones signs his own checks. Anderson transports Dr. Jones to all of his appointments and helps to administer his medications. Anderson testified, "I am with him 24 hours a day." Regarding Dr. Jones's fall at home on September 27, 2021, Anderson stated that Dr. Jones's head stopped bleeding shortly afterward and when he called Dr. Calhoun's office, the staff advised them to go to the emergency room. Anderson testified that he had received advice to avoid the emergency room due to the COVID-19 pandemic. He and Dr. Jones decided together to go to an urgent care clinic the next morning; from there, they were sent to the emergency room. After hours of observation, Dr. Jones was released from the hospital and sent home. Anderson testified that the patient call note from Dr. Calhoun's office that stated he did not want to take Dr. Jones to the emergency room was inaccurate.

Anderson also testified regarding the $5,000 of Dr. Jones's funds that Skirvin used to seek Dr. Jones's interdiction, saying her decision to go to the bank alone to handle the maturation of the CD "set off alarms to [Dr. Jones] and me." Anderson testified that Skirvin did not produce a receipt for them of the deposit, which worried Dr. Jones. Anderson claimed that Dr. Jones knew nothing about the $5,000 retainer to attorney Campbell until the two of them went to a different Cross Keys Bank branch location and spoke to a teller there. Anderson testified that Dr. Jones was angry and upset that Skirvin took the $5,000 without discussing it with him.

Anderson testified that any information he relayed to Dr. Jones's doctors came directly from Dr. Jones, and he does not attempt to influence him. Anderson denied interfering in Dr. Jones's relationship with Skirvin, and that prior to their current issues, he and Skirvin had gotten along, and he did not have any issues with her. Anderson confirmed that he had never attended any of Dr. Jones's visits to Indiana but that Dr. Jones had enjoyed going to visit the family farm.

On cross-examination, Anderson testified that he is more than a friend, caretaker, or companion, and that he and Dr. Jones are partners.[7] Anderson testified that he cooks breakfast for them, and Dr. Jones dresses himself in the mornings. Anderson assists him with bathing, but Dr. Jones goes to the bathroom on his own. Anderson explained that Dr. Jones sleeps in the bed, and he sleeps in a recliner near the bed and is awake when Dr. Jones goes to the bathroom in the night. When asked by the trial court judge if he believed that Dr. Jones could make decisions on a daily basis that are good for him about his person and his property, Anderson acknowledged: "He needs help."

Skirvin also testified at the final interdiction hearing stating that during the court-ordered visits to her uncle's home in February 2022, Anderson was interfering with her ability to enter the home. Skirvin testified that on February 20, 2022, she rang the doorbell, and her uncle initially told her he did not want to see her. Skirvin was ultimately able to enjoy her visit, but testified that Dr. Jones was nervous because she believed

---

[7] Anderson testified: "Well, you think gay people go out and just split that to everybody? A lot of people don't take that good. So, you just don't go out spewing it to everybody. When you live with somebody twenty years you kind of figure they're going to figure it out."

18

he knew Anderson would be back home soon. On February 27, 2022, Dr. Jones told her he did not want to see her, and she was not able to enter his home. Skirvin explained that other friends of Dr. Jones and Anderson's were in the house, hovering and preventing her from coming inside. Throughout March and April 2022, Skirvin was again personally told by Dr. Jones that he did not want her to come inside, and she was not able to have her visits with him. On one occasion, she waved down a police officer who was driving by and explained that she was there trying to visit her uncle and Anderson was preventing her from doing so.

Skirvin testified that she is acting to protect Dr. Jones from Anderson. She reiterated her prior testimony that she did discuss that $5,000 retainer for attorney Campbell with Dr. Jones, and she produced a receipt for him and Anderson on October 6, 2021. She testified, in relation to October 6, 2021, that Dr. Jones "keeps meticulous records and in his desk he has binders, the receipt was shown to him." Skirvin testified that she is concerned about Anderson handling Dr. Jones's finances, because Dr. Jones's signature appears different on some of his checks, and she has seen some checks to cash. Skirvin communicated with Cross Keys Banks and obtained a copy of Dr. Jones's transaction history. Skirvin admitted she does not have any actual evidence that Anderson is taking Dr. Jones's money. The complete absence of any evidence to support Skirvin's repeated allegations of financial impropriety by Anderson on any level will be addressed in greater detail below.

Skirvin testified that the plan with Dr. Jones since 2003, when he granted her the power of attorney, was that he would eventually move back

to Indiana. She testified that, more recently, Dr. Jones has said he would like to stay in Monroe, and she was accommodating his request. Skirvin testified that she was renting a home in Monroe, but her children and grandchildren all reside in Indiana. Skirvin testified that Dr. Jones never referred to Anderson as anything other than a friend. Skirvin testified that Dr. Jones has had relationships in the past, and those other partners came and visited her home, while Anderson had not.

Dr. Jones testified at his own interdiction hearing. He testified that he and Anderson live together, and have for a long time; Anderson helps him, and he is dependent on him. When asked whether he had any doubt about Anderson's faithfulness to him as a friend, Dr. Jones responded: "Oh, I have no doubt about that. A true friend." Dr. Jones testified that he did not recall speaking with Skirvin about her paying $5,000 to attorney Campbell. He testified he was upset when he learned about it, because "we didn't discuss it or anything, she just did it." Dr. Jones did not specifically remember the purpose of the $5,000. Dr. Jones testified that after the issue with the deposit, he appointed Anderson as his power of attorney. Dr. Jones testified that he remembered talking to his friend, Nanette Dennig, about the power of attorney. He stated: "She is a personal friend and her husband helps us with a lot of our needs. He's a carpenter and all." Dr. Jones testified that Anderson did not influence him as to his choice of power of attorney. Dr. Jones did not specifically remember signing a new will on the date he assigned a new power of attorney to Anderson, but did remember his donation of the one-half interest in their house to Anderson. When asked if he understood what he was doing when he made the donation, he responded:

"Well, yes. Sure." Dr. Jones testified that he remembered cancelling Skirvin's power of attorney, explaining that he did not "feel like I could work with her." Dr. Jones testified that if someone were appointed to take care of him, he would want that person to be Anderson. Dr. Jones stated: "Well, we've been together for quite a while and he knows my needs and so on and he's been taking care of me and we've worked together and lived together and so, I have appreciated that."

On cross-examination, Dr. Jones could not recall who his attorney was in 2003 when he appointed Skirvin as his power of attorney. Dr. Jones testified that he and Skirvin are not close anymore because his trust in her has diminished. When Skirvin took the $5,000 from his CD, Dr. Jones recalled that it was "about a year ago." Dr. Jones agreed that his memory was not good. When asked who he considered his attorney to be, Dr. Jones responded: "I'm trying to think what I used attorneys for. I don't know." He could not recall the names of the restaurants he previously owned in Monroe, but did recall that he had sold them. Dr. Jones remembered his evaluation with Dr. Weinholt. Dr. Jones confirmed that he understood that Anderson had a power of attorney for him. He testified that he signs his own checks, with the assistance of Anderson balancing his checkbook.

Nanette Dennig testified that she has known Dr. Jones for about 35 years. Dennig works in attorney Rountree's office and was present on October 27, 2021, when Dr. Jones made changes to his will and executed the power of attorney for Anderson. Dennig confirmed that Anderson did not speak when Rountree was working with Dr. Jones on the documents. Dennig testified that she did not have any doubt that Dr. Jones understood

21

what he was doing. She testified that Dr. Jones read the documents and signed them on his own. After two days of testimony, the interdiction hearing concluded on July 8, 2022.

On July 22, 2022, a hearing was held regarding the ruling on the petition for interdiction. During his oral ruling, the trial court stated that there was clear and convincing evidence that Dr. Jones was incapable of making consistently reasonable decisions regarding the care of his person and property. As to whether there are less restrictive means available to protect his interest, the trial court voiced concerns regarding the validity of the power of attorney in favor of Anderson executed on October 27, 2021. The trial court also noted that the previous power of attorney in favor of Skirvin dated back to 2003. The trial court did not declare the October 27, 2021 power of attorney invalid, but expressed its concerns. The trial court stated:

> However, in this case unlike, I guess every case stands on its own, but in this case I think there are some real issues, real concern, doubt, I don't know what the right adjective might be about, whether or not that power of attorney that was executed in October is in fact valid. **That was not what was at issue in this proceeding**, but I do have some little doubts about whether or not Dr. Jones was capable when he did execute those documents in October. (emphasis added)

Apparently recognizing the acrimonious relationship that had developed between Skirvin and Anderson, the existence of competing powers of attorney, and the certainty of protracted litigation regarding those documents and others in the waning years of Dr. Jones's life, the trial court found that there were no less restrictive means than full interdiction to protect Dr. Jones. The trial court granted a full interdiction of Dr. Jones. Skirvin was

22

appointed as the curator of Dr. Jones's property and undercurator of his person, and Anderson was appointed as curator of Dr. Jones's person, and undercurator of his property. The trial court arranged for a schedule of visitation between Skirvin and Dr. Jones. The trial court explained that Skirvin would be responsible for all property issues, and Anderson would be responsible for Dr. Jones's day-to-day care and maintaining his medical regiment.

The written judgment of interdiction was entered on August 4, 2022. Dr. Jones now appeals the full interdiction and appointment of Skirvin as curator.

## DISCUSSION

Dr. Jones asserts three assignments of error (verbatim):

1. Skirvin did not bear the burden of proving necessity for interdiction.

2. In October 2021, when Dr. Jones granted Anderson power of attorney, he had the requisite legal capacity; the power of attorney is a valid act.

3. If grounds for interdiction existed, and they did not, Anderson should have been appointed curator.

**Assignment of Error Number 1: Skirvin did not bear the burden of proving necessity for interdiction.**

Dr. Jones contends that Skirvin failed to prove by clear and convincing evidence that Anderson posed a threat to the person or property of her uncle and that there was not a means of protecting his interests that is less restrictive than an interdiction.

La. C. C. art. 389 provides, with emphasis added:

> A court may order the full interdiction of a natural person of the age of majority, or an emancipated minor, who due to an infirmity, is unable consistently to make reasoned decisions regarding the care of his person and property, or to

23

> communicate those decisions, **and** whose interests
> cannot be protected by less restrictive means.

Thus, only if a person is consistently unable to make reasoned decisions regarding the care of both his person and his property, or to communicate those decisions, is he a candidate for full interdiction. This initial threshold inquiry must be satisfied before there is a need to consider less restrictive means as an alternative.

A person is unable to consistently make reasoned decisions if, for example, he suffers from an infirmity which intermittently deprives him of reason. La. C.C. art. 389, Revision Comments (d). Full interdiction is a last resort and, as a result, is warranted only when a person's interests cannot be protected by less restrictive means. A person's interests can be protected by less restrictive means if, for example, his interests (1) are currently being protected by other legal arrangements, including a procuration, mandate, or trust, or (2) could be protected by other legal arrangements, including limited interdiction. If the court determines that less restrictive means can protect the defendant's interests, the court should deny full interdiction. La. C.C. art. 389, Revision Comments (e).

The petitioner in an interdiction proceeding bears the burden of proof by clear and convincing evidence. La. C.C.P. art. 4548; *see also, In re Clement*, 45,454 (La. App. 2 Cir. 8/11/10), 46 So. 3d 804. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. *In re Interdiction of DeMarco,* 09-1791 (La. App. 1 Cir. 4/7/10), 38 So. 3d 417.

This court recognizes the tremendous implications and ramifications of interdiction. Interdiction is so harsh a remedy that it has been described as "a pronouncement of civil death without the dubious advantage of an inscription thereof on a tombstone." *Doll v. Doll,* 156 So. 2d 275 (La. App. 4 Cir. 1963). Since it is so harsh, interdiction may not be used as a matter of convenience, hence the stiff burden of proof. *Interdiction of Lemmons,* 511 So. 2d 57 (1987). The determination of whether to order interdiction is a finding of fact. Thus, the trial court's judgment will not be set aside in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD,* 617 So. 2d 880 (La. 1993).

The initial inquiry in the present matter is whether Dr. Jones is consistently able to make reasoned decisions regarding the care of his person and property, or to communicate those decisions as set forth in La. C. C. art. 389. In reaching its conclusion that Dr. Jones was not able to do so, the trial court had the benefit of evidence and testimony from Dr. Jones's treating physicians as well as a court-appointed expert in the field of geriatric psychiatry.

There is no dispute that Dr. Jones received a diagnosis of dementia in or around January 2020. The testimony of Dr. Calhoun, Dr. Stucki, and Dr. Weinholt offer insight into Dr. Jones's condition over the few years immediately prior to the filing of the petition seeking his interdiction. The testimony of each physician confirms that Dr. Jones has suffered from mild to moderate dementia since at least early 2020. A diagnosis of mild to moderate dementia in and of itself, however, would not necessitate such a harsh remedy as full interdiction. A more detailed and in-depth inquiry must

25

be undertaken to determine the extent of symptoms exhibited and the full extent of the intended interdict's reasoning and functioning.

All three of the medical experts who testified in court or by deposition recognized that Dr. Jones could not *consistently* make reasoned decisions regarding his person or his property. Dr. Calhoun expressed concerns about Anderson's caregiving and testified that he did not believe that Dr. Jones possessed the requisite capacity to change his power of attorney on October 27, 2021. His opinion contained in his October 4, 2021 letters to Skirvin was that Dr. Jones should not sign legal documents without his power of attorney present. While the comments from Dr. Calhoun are not medical treatment and wander more into legal conclusions, they may be helpful to the trial court nonetheless.

On December 2, 2021 – over a month after Dr. Jones executed his new power of attorney in favor of Anderson – Dr. Stucki provided his opinion that his dementia was in the mild stages but that his mental decline was progressing. He acknowledged that Dr. Jones did require assistance with finances. Dr. Stucki stated that if things were explained to him in simple terms, he could make reasonable decisions.

On April 8, 2022 – three months after interdiction proceedings had been initiated – Dr. Weinholt examined Dr. Jones. The record clearly shows that Dr. Weinholt had experience in evaluating individuals in the context of an interdiction proceeding. During his testimony at the final interdiction hearing, Dr. Weinholt, in responding to questioning from the trial court directed to the foundational concern in considering a request for interdiction, described Dr. Jones's condition as follows:

Q: […] [D]o you believe that gentleman, Dr. Jones, can consistently make reasoned decisions about his person or his property irrespective of somebody helping him or a power of attorney, just as a general statement?

A: Without help of someone he trusts I don't think so, no.

Dr. Weinholt's assessment of Dr. Jones and his conclusion that Dr. Jones lacked the ability to consistently make reasoned decisions about his person or property satisfies the initial threshold required by La. C. C. art. 389. It was not manifestly erroneous for the trial court to rely on the testimony of the treating physicians, court-appointed medical examiner, and others to conclude Dr. Jones was unable consistently to make reasoned decisions regarding the care of his person and property.

While such a consideration permits a "yes" or "no" conclusion with the assistance of testimony and evidence from treating physicians and court-appointed experts, the second consideration in determining if viable less restrictive means to interdiction are available is a far more complex analysis. In reaching a decision on that issue, the court must consider the totality of the circumstances and best interest of the proposed interdict and factors in his everyday life in reaching its conclusion.

As noted above, La. C.C. art. 389 provides the second consideration for a full interdiction – whether Dr. Jones's interests can be "protected by less restrictive means." Such a task is not a simple inquiry. Concerning Dr. Jones, the record reveals a possible "less restrictive means" could potentially be a previously executed power of attorney. Here, we have two powers of attorney: one in favor of his niece, Skirvin, and the other in favor of his companion and caretaker for almost 20 years, Anderson. The record makes

clear that Skirvin and Anderson are clearly at odds and are entrenched in their opposition to the other. Dr. Jones, unfortunately, is caught in the middle.

On one hand, there is Skirvin's power of attorney, which was revoked by Dr. Jones, his repeated expressions of displeasure that she diverted $5,000 of his funds to attempt to interdict him, and his testimony that he no longer could work with her. Skirvin's actions clearly damaged their relationship in the eyes of Dr. Jones, which he reiterated in his testimony to the trial court. Her role as agent was replaced by Anderson in the subsequent power of attorney in his favor from Dr. Jones, who testified he wanted and trusted his almost 20-year companion to act in his best interest. On the other hand, Anderson, the longtime companion of Dr. Jones, is named in recent powers of attorney and is the beneficiary of bequests and donations which have clearly been telegraphed by Skirvin to be the subject of impending added litigation. Skirvin suggests both the power of attorney in favor of Anderson and the revocation of her power of attorney were executed during a time Dr. Jones lacked requisite capacity and potentially were the product of fraud or undue influence. Skirvin solicited letters to that effect to support her planned action to interdict Dr. Jones. Regardless of Skirvin's allegations, the legitimacy and effect of the power of attorney in favor of Anderson and revocation of the power of attorney in favor of Skirvin have not been directly challenged. However, the likelihood of Dr. Jones spending the remaining years of his life in depositions or trials appears very likely on those issues, as well as potential challenges to the codicil to Dr. Jones's will, which had previously been primarily in favor of Skirvin.

Sadly, nothing primes the pump of contention and litigation like an estate with assets and legatees ready to battle over competing wills and bequests. Consideration by the trial court of that very real possibility is also an appropriate consideration in determining if a "less restrictive means" than interdiction of Dr. Jones is available. Is there a power of attorney (or two)? Yes. Is it highly suggestive of litigation on multiple issues – both the revocation and new power of attorney? Yes. Is involving 87-year-old Dr. Jones in continued protracted litigation *all at his expense* over the remaining years of his life in his best interest? Clearly, no. The consideration should focus on Dr. Jones's interests, his person, and his property. The integrity of his life, which for the last 20 years with Anderson had operated smoothly with appropriate medical care and no financial improprieties, is a legitimate consideration here. The absence of any evidence to support Skirvin's repeated claims of impropriety of Anderson is another.

Considering the unique facts and circumstances of this matter, with competing powers of attorney, revocations, out-of-state relatives, and a longstanding companion, as well as the near certainty of continued and expanded litigation at Dr. Jones's expense in what are likely the waning years of his life, we find it was not manifestly erroneous for the trial court to conclude there is no less restrictive means available other than full interdiction of Dr. Jones to be in his best interest. Such a result ends litigation over the effectiveness of competing powers of attorney between Skirvin and Anderson.

This determination pretermits consideration of Dr. Jones's second assignment of error regarding Anderson's power of attorney, which now is

29

of no effect for future actions, and we move to consideration of the third assignment of error regarding the appointment of a curator.

**Assignment of Error Number 3: If grounds for interdiction existed, and they did not, Lloyd Anderson should have been appointed curator.**

Dr. Jones argues that the October 27, 2021 power of attorney specifically provides that Anderson is nominated to be his curator. He argues that Anderson satisfies two higher criteria provided in La. C. C. P. art. 4561(C)(1), which provides that the court shall consider the qualified persons in the following order of preference:

> (a) **A person designated by the defendant in writing signed by him while he had sufficient ability to communicate a reasoned preference.**
>
> (b) The spouse of the defendant.
>
> (c) An adult child of the defendant.
>
> (d) A parent of the defendant.
>
> (e) **An individual with whom the defendant has resided for more than 6 months prior to the filing of the petition.**
>
> (f) Any other person. (emphasis added).

Dr. Jones notes that Skirvin qualifies under La. C. C. P art. 4561(C)(1) only as "any other person" and the power of attorney in her favor has been revoked. Anderson, however, has been designated by Dr. Jones in a power of attorney, and he was also identified by Dr. Jones to Dr. Weinholt and the trial court judge as the person he prefers. Additionally, Anderson has resided with Dr. Jones for decades, far in excess of the 6 months provided in La. C. C. P. art. 4561(C)(1)(e), which is another significant factor in favoring Anderson as curator for Dr. Jones.

30

After determining that Dr. Jones was unable consistently to make reasoned decisions regarding the care of his person and property, or to communicate those decisions, and (due to the very unique and litigious environment directly impacting Dr. Jones) that his interests could not be protected by less restrictive means, the trial court then appointed Anderson as the curator of Dr. Jones's person and Skirvin as curator of Dr. Jones's property. It is this decision, to place Skirvin as curator over the day-to-day finances of Dr. Jones, that we take issue and find to be manifestly erroneous under the circumstances.

As detailed above, Skirvin resides in Indiana. The power of attorney from decades ago has been revoked. She is clearly at odds with Dr. Jones as a result of using $5,000 of his own money in an attempt to interdict him. She has made several repeated allegations and statements about substandard care of Dr. Jones by Anderson, which are not supported in the record. She has also repeated scandalous allegations against Anderson of misappropriation of funds from Dr. Jones by repeatedly including those allegations in pleadings in this matter and by expressing those same allegations to Dr. Calhoun and others. At no point in the proceedings, including at the hearings, could Skirvin produce any evidence to support those serious and oft-repeated allegations. As one illustration, regarding allegations of Anderson taking money from Dr. Jones – allegations she asserted in the petition for interdiction and repeated in her requests for a temporary restraining order and preliminary injunction – Skirvin eventually had to answer under oath during cross-examination at trial:

> Q: […] But do you have any evidence of Lloyd
> Anderson taking your uncle's money?

31

A: I don't personally.

Considering the absence of any evidence whatsoever of financial mismanagement or other impropriety by Anderson during the 20 years of residing with and caring for Dr. Jones, and Anderson's satisfying at least two preferential considerations in being designated as curator, pursuant to La. C. C. P. art. 4561(C)(1), the appointment of Skirvin to oversee the financial affairs of Dr. Jones is manifestly erroneous. Inserting Skirvin in the decision-making role over Dr. Jones's finances all but guarantees circumstances where every expense and utility bill, medical or pharmacy expense, and everything else in the normal course of life as has existed for almost two decades will result in delay and animosity in the ongoing conflict between Anderson and Skirvin. None of this is in Dr. Jones's best interest, to either his person or his property. The day-to-day existence of Dr. Jones is only made exponentially more difficult by placing Skirvin in such a position of authority and control, when there is no evidence of any impropriety by Anderson. Dr. Jones expressed a desire in the new power of attorney, to Dr. Weinholt, and at trial, that his trusted companion, Anderson, be the person to serve as his caretaker and look after his person and property. Appointing Skirvin as his undercurator – a relative with a history of involvement with Dr. Jones – will allow her access to ensure his continued care and property are managed appropriately. However, she should not be in the position to exert day-to-day financial or care decisions over Dr. Jones's person or property, as long as Anderson is available to continue to fulfill the duties the record indicates he has successfully and dutifully fulfilled these many years. Considering the foregoing, we find the trial court's appointment of Skirvin

32

as curator of Dr. Jones's property to be manifestly erroneous. We modify the judgment to name Anderson as curator of Dr. Jones's person and property, and to name Skirvin as undercurator of Dr. Jones's person and property.

## CONCLUSION

Accordingly, we affirm the full interdiction of Dr. Jones and modify the judgment of the trial court by naming Anderson as curator of Dr. Jones's person and property and name Skirvin as undercurator of both Dr. Jones's person and property. Costs of this appeal are split half to appellant, Dr. Jones, and half to appellee, Skirvin.

**AFFIRMED AS AMENDED.**